Stephen JUZWIN and Mary Juzwin, his spouse, Plaintiffs,

v.

AMTORG TRADING CORP., et al., Defendants.

AMTORG TRADING CORP., Defendant–Third Party Plaintiff,

v.

LEONARD J. BUCK, INC., Flintkote Mines, Ltd., National Gypsum Company and Turner & Newall, PLC., Third Party Defendants.

Civil No. 87–3876.

United States District Court, D. New Jersey.

March 9, 1989.

1054

Garruto, Galex & Cantor, Francis A. Tomes, East Brunswick, N.J., for plaintiffs.

Budd Larner Gross Picillo Rosenbaum Greenberg & Sade, P.C., John J. Catino, Short Hills, N.J., for defendant-third party plaintiff Amtorg Trading Corp.

McCarter & English, Honora M. Keane, Charles F. Rysavy, Newark, N.J., for defendant Carey Canada, Inc.

Goldfein & Joseph, P.C., David A. Katzenstein, Scott I. Fegley, Princeton, N.J., for defendants Asbestos Corp. Ltd. and Bell Asbestos Mines, Ltd.

Bressler, Amery & Ross, Gladys W. Orr, Morristown, N.J., for defendant, Metropolitan Life Ins. Co.

O'Donnell, Kennedy, Vespole & Piechta, Leon B. Piechta, West Orange, N.J., for defendant, Leonard J. Buck, Inc.

## OPINION

SAROKIN, District Judge.

In this asbestos-related products liability action, defendants move that the court strike plaintiffs' punitive damages claims on the ground that they are unconstitutional.

## I. INTRODUCTION

Punitive damage awards have played a traditional role in our system of jurisprudence. They provide a means by which private citizens are afforded the opportunity to penalize persons or entities whose conduct has been so offensive and outrageous as to permit punishment of the wrongdoer in civil litigation. Such awards have been accepted and justified under the same rationale which guides much of sentencing in criminal matters.

The wrongdoer is punished and thus deterred from other similar conduct in the future. Others, likewise, are deterred who might be inclined to act in a similar fashion. The punitive damage award, and in particular the amount of such an award, affords a jury the unique opportunity to express the community's outrage at the particular conduct being penalized. Such awards frequently fill a void where the conduct is not

defined as criminal, or if criminal, is not prosecuted.

The policy and purpose of punitive damage awards are well served in products liability cases in which manufacturers have knowingly placed dangerous or defective products into the marketplace with no or inadequate warnings. Civil penalties serve to remind manufacturers of consumer expectations regarding business ethics and standards. Therefore, there can be little doubt that the availability and even the threat of punitive damage awards serves the public interest and provides a strong inducement to the business community to act in a reasonable and responsible manner.

Punitive damage awards have their deficiencies, however, some of which inhere in all such awards and some of which are unique to mass tort claims. Common to all is the fact that the amount of the fine can be excessive in respect to the conduct involved or the person or entity assessed. No limits are imposed. Certainly, no criminal statute would be tolerated which left to a judge or a jury the unfettered discretion to determine what penalty would be appropriate in any given case. No standard or uniformity exists. Different juries hearing the identical evidence as to the same defendant might award vastly different sums or none at all.

The court in a criminal matter may consider the defendant's ability to pay in determining the fine to be imposed, but no statute would be permitted which failed to set the maximum possible penalty faced by a defendant. Although the penalty imposed in a civil matter may far exceed that provided for under a criminal statute for the same conduct, none of the same safeguards are provided. The standard of proof for the imposition of such penalties is lesser in civil matters, even though the exposure may be far greater. Privileges such as the right against self-incrimination are usually inapplicable.

Substantial punitive damage awards have the ability to financially destroy an individual, a business, or an entire industry. Such insolvency may be warranted or justified because of the nature of the conduct involved, but it is an awesome power to place in the hands of a jury without limitations or guidelines.

Fines paid in criminal matters go to the public treasury. Punitive awards go to the fortuitous plaintiff. In many instances, it is a windfall.

All of the foregoing defects are exacerbated in mass tort litigation. Defendants can be held liable over and over again for the same conduct, a result which would be barred by virtue of the right against double jeopardy in a criminal matter. Although an award in an individual case may be fair and reasonable, the cumulative effect of such awards may not be. Nor is the cumulative effect of such awards reviewable by a single court, since the matters are permitted to proceed and be reviewed separately and independently.

Payment to individual plaintiffs rather than to a fund or a class raises special problems in mass tort litigation. There is a decided risk that the earlier claimants will deplete the available assets to pay later claimants. Such a risk may exist even as to compensatory damages, but it would seem inappropriate to impose repeated *penalties* on a company if the result is to deny *compensatory* damages to subsequent claimants. If there is a limited fund, priority should be given to compensating those who have been injured rather than conferring windfalls on those who have already been compensated.

Although recognizing the nature of a corporation as a continuing legal entity, the fact is that punitive damage awards, if imposed decades after the wrongful conduct, frequently punish officers who did not participate in such conduct and shareholders who did not benefit from it. Furthermore, if the successive fines serve to render companies insolvent, innocent employees and trade creditors are injured as well.

It may be that the conduct of a particular defendant has been so outrageous and egregious that a jury wishes by the size of its award to prevent that company from continuing to function. Even assuming that a jury should have the awesome power

to mete out such drastic punishment, it should do so intentionally, and not inadvertently by unknowingly combining its verdict with those in the past and those yet to come.

None of the foregoing, standing alone, may be sufficient to constitute a violation of the constitutional rights of these manufacturers, but taken in combination they do infringe upon their right to due process.

## II.

Having set forth the potential defects and dangers of successive punitive damage awards, the court next considers the solutions suggested as potentially available to provide a cure.

It has been suggested that one of the means available to a defendant to combat the cumulative effect of successive punitive damage awards against it is to offer evidence as to the prior awards and ask the jury to offset their own verdict to the extent of those earlier awards. This alternative, although valid in concept, is unrealistic in practice. It requires a defendant to advise the jury that prior juries hearing the same evidence have already found that the defendant's conduct was so egregious as to warrant punitive damage awards. To require a defendant to present such prejudicial evidence to a jury as its only alternative is to place it between Scylla and Charybdis.[1]

Individual awards are also justified on the basis that each plaintiff who has been injured is entitled to seek punishment of the offender. However, such an argument totally ignores the fact that each jury is told how many persons have been injured or have died or are likely to do so as the result of the defendant's conduct. Those statistics undoubtedly play a substantial role in the jury's decision to award punitive damages and in determining the amount to be imposed. Therefore, it is totally unrealistic to suggest that each award is predicated solely on the conduct of the defendant manufacturer as it relates only to the plaintiff on trial. The amount of the award is the product of injuries to many persons not before the court. The same statistics form the basis for all such claims. Therefore, prior punitive awards may have already factored in the injury to the plaintiff on trial.

Another suggestion for blunting the potential of multiple punitive damage awards is a preemptive class action by the manufacturer to establish a single punitive damage award binding upon all present or potential claimants. The availability of this option is undoubtedly as comforting to the defendant manufacturers as the ability to tell the jury that others had found them guilty of willful, wanton and reckless conduct. If the existence of this alternative serves to deny defendants so situated the right to claim that successive punitive damage awards for the same wrongful conduct are unconstitutional, then manufacturers would be placed in an unenviable dilemma as soon as a second suit was instituted. Should any manufacturer at that juncture be required to notify and invite all of its customers and users to file claims against it? Furthermore, even if a defendant were inclined to adopt this suicidal course, there is some doubt whether it would be successful. *See, e.g., In re School Asbestos Litigation,* 789 F.2d 996, 1006 (3d Cir.1986), *cert. denied, Celotex Corp. v. School District,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed. 2d 117 (1986) and *cert. denied, National Gypsum Co. v. School District,* 479 U.S. 915, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986) (noting the difficulties in expanding a class to "confront effectively the punitive damage issue in the entire asbestos area"); *see infra* at 1062-64. In any event, it is not a life preserver likely to be grasped by a manufacturer.

It has also been suggested that the risk of excessive awards is obviated by the ability of the trial court, and thereafter the

---

1. A more appropriate remedy would be to permit the court to reduce the jury award to the extent of any prior awards based upon the same conduct rather than have the jury hear such prejudicial evidence. However, the parochial concerns of the courts of the various states and the vague guidelines for justifying a judicial determination of "excessiveness" of awards, *see infra* at 1056–57, render this remedy an ineffectual alternative.

appellate court, to reduce or totally set aside the jury award. However, the right to review is no more satisfactory than the jury's initial determination, because it is dependent upon the visceral reaction of the court rather than on any established or recognized standards. Courts which have undertaken to reduce or set aside punitive damage awards have been hard-pressed to enunciate reasons why in the court's view the amount fixed by the jury is too high. With the vague guidance given to juries as to the means for calculating such damages, it is difficult to justify judicial intercession on the basis that the amount of the award is invalid as a matter of law. What occurs in reality is an independent factual finding by the court simply that the penalty is too great. Defendants are entitled to know that there is a more substantial ground for appeal other than that the verdict offends the "gut feeling" of the trial or reviewing court.

Others point to the fact that most mass tort claims are settled, thereby minimizing the Draconian consequences envisioned of a multitude of destructive punitive damage awards. This contention, however, ignores the potential for such awards as a motivating factor in the settlement negotiations, which affects both the demands made by plaintiffs and the offers from defendants. Therefore, the existence of numerous settlements does not obviate the need to re-evaluate the constitutionality of punitive damage awards in mass tort litigation, because they are a potent force in those negotiations.

2. Defendant Carey Canada, Inc. asserts that it "has been threatened with punitive damages in thousands of cases around the country. As of November 30, 1988, Carey was named as a defendant in 13,022 cases involving 18,118 plaintiffs in actions pending throughout the country. Although precise data is not available, a very conservative estimate would be that punitive damages are alleged in 70% of these cases. As such, Carey is forced to defend itself against allegations of punitive damages in at least 9,000 cases presently pending throughout the country. Most importantly, every one of these cases involves allegations of punitive damages arising out of the same general course of conduct; that is, Carey's sale or distribution of asbestos fiber without a warning or with an inadequate warning allegedly in a reckless, malicious or wanton

### III.

Defendants cite three constitutional bases for their argument that multiple awards of punitive damages are impermissible. Pointing to parallels between the assessment of punitive damages and fines levied in criminal proceedings, defendants argue that the concepts of double jeopardy and excessive fines contained in the Fifth and Eighth Amendments should be applied in the civil context to prohibit multiple awards of punitive damages for a single course of culpable conduct. Defendants also argue that the Due Process Clause of the Fourteenth Amendment places a constitutional limitation on the amount of punitive damages that may be awarded or on the number of occasions on which a defendant will be forced to defend against punitive damages for the same course of conduct.

### A. The Double Jeopardy Clause of the Fifth Amendment

Defendants first contend that "[t]he imposition of punitive damages against defendants in this case would violate their right to not 'be twice put in jeopardy of life or limb.'" Trial Memorandum of Defendant Carey Canada, Inc. at 70. Defendants assert that "some defendants have previously been assessed, and all have been threatened with, punitive damages in other asbestos cases," and that these damages were imposed for the same conduct which is the basis for plaintiff's punitive damages claim.[2] *Id.*

manner. Each claim for punitive damages does not allege a separate act by Carey peculiar to that case." Supplemental Brief of Defendant Carey Canada, Inc. at 1. Counsel for Carey point to one case in which punitive damages have already been assessed against Carey for this course of conduct, and assert that Carey has paid the $75,000 punitive damages award. *Id.* at 2.

Defendant ACL asserts that it, too, has been threatened with many punitive damages claims throughout the country: "In New Jersey alone, ACL has been named as a defendant in 369 cases involving 1,642 plaintiffs, as of January 13, 1989. Although precise data is not available, plaintiffs routinely request punitive damages in complaints served on ACL on an almost daily basis. We feel it is safe to assume that the

The Double Jeopardy Clause of the Fifth Amendment is explicitly limited in application to proceedings which are criminal in nature. It states in relevant part: "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." The Supreme Court has extended the application of the double jeopardy clause to actions which are "quasi-criminal" in nature, almost invariably in situations where a statute provided for both criminal and civil sanctions and proceedings were brought by the government against a defendant under both the criminal and civil sections of the statute. *See, e.g., Rex Trailer Co., Inc. v. United States,* 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149 (1956); *United States ex rel Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943); *Murphy v. United States,* 272 U.S. 630, 47 S.Ct. 218, 71 L.Ed. 446 (1926); *Various Items of Personal Property v. United States,* 282 U.S. 577, 51 S.Ct. 282, 75 L.Ed. 558 (1931). In those situations, the Court looked to the nature and purposes of the civil section to see if it was "remedial" or "punitive" in nature and evaluated whether the effect of the civil section was so punitive as to override the civil intent of the legislature in providing for the civil penalty.

In contrast to the civil statutes which were the basis for the Court's analysis in the above cited cases, punitive damages are a creation of the judiciary, not of the legislature, and thus the analysis of the Court in those cases does not directly apply in the present context. Clearly, punitive damages are intended to be imposed in the context of a civil proceeding. Just as clearly, however, they are meant to be punitive in nature and not remedial, and thus are more closely analogous to criminal penalties than the sanctions imposed by civil statutes. The Supreme Court has stated:

"Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct." *City of Newport v. Fact Concerts,* 453 U.S. 247, 266–67, 101 S.Ct. 2748, 2759, 69 L.Ed.2d 616 (1981). Punitive damages are thus not a compensatory award, but are rather "private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974).

Despite the close analogy between criminal sanctions and punitive damages, punitive damages are not a criminal sanction. *Cf. Nappe v. Anschelewitz, et al.,* 97 N.J. 37, 477 A.2d 1224 (1984). In *Breed v. Jones,* 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975), the Court defined the risk to which the Double Jeopardy Clause refers as

that traditionally associated with "actions intended to authorize criminal punishment to vindicate public justice." Because of its purpose and potential consequences, and the nature and resources of the State, such a proceeding imposes heavy pressures and burdens—psychological, physical, and financial—on a person charged. The purpose of the Double Jeopardy Clause is to require that he be subject to the experience only once "for the same offence."

421 U.S. at 529–30, 95 S.Ct. at 1786 (citations omitted). Here, defendants have violated no criminal statute, little if any stigma would be attached to an award of punitive damages as compared to a criminal conviction, and the action itself is a private action in which the state authorities are not involved. *See also, Hansen v. Johns-Man-*

majority of the 369 cases currently pending in New Jersey in which ACL has been named as a defendant involve claims for punitive damages." Letter of Counsel for Asbestos Corporation Limited dated January 17, 1989 at 1. ACL contends that the claims for punitive damages against it arise out of a single general course of conduct, involving the distribution of asbestos fiber without an adequate warning in a reckless, mali-

cious, or wanton manner, and do not allege a separate act with respect to each individual plaintiff. *Id.* ACL has not had an award of punitive damages entered against it as of this date, but contends that it should not be forced to defend against repeated claims for punitive damages based upon one course of conduct. *Id.* at 2.

*ville Products Corp.,* 734 F.2d 1036, 1042 (5th Cir.1984), *cert. denied,* 470 U.S. 1051, 105 S.Ct. 1749, 84 L.Ed.2d 814 (1985) (punitive damages action not "essentially criminal" and thus multiple awards of punitive damages do not violate double jeopardy).

■ Thus, although imposed for punitive purposes, punitive damages do not necessarily require application of the constitutional protections reserved for criminal proceedings. The court concludes that actions for punitive damages are not sufficiently "criminal" in nature to require the protection of the Double Jeopardy Clause of the Fifth Amendment. The court concludes that the Double Jeopardy Clause thus cannot be the basis for striking plaintiff's claim for punitive damages as repetitive of prior actions based on the same conduct.

### B. The "Excessive Fines" Clause of the Eighth Amendment

Defendants' next argument is that an award of punitive damages would violate the "excessive fines" clause of the Eighth Amendment, which states:

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

Plaintiff contends that the protections of the Eighth Amendment do not apply to a civil action for punitive damages, since the Eighth Amendment was intended to apply solely to criminal proceedings. Brief in Support of Plaintiff's Claim for Punitive Damages at 4. The Supreme Court has held that the "cruel and unusual punishment" clause of the Eighth Amendment applies only to punishment which is criminal in nature, *Ingraham v. Wright,* 430 U.S. 651, 664, 97 S.Ct. 1401, 1408, 51

L.Ed.2d 711 (1977), but it is unclear whether the "excessive fines" clause of that amendment is also limited to criminal proceedings.[3]

There is nothing in the language of the Eighth Amendment itself which specifically limits the "excessive fines" clause to criminal sanctions.[4] In *Aetna Life Insurance Co. v. Lavoie,* 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986), the Court did not reach the issue of whether the "excessive fines" clause of the Eighth Amendment prohibited a punitive damage award of 3.5 million dollars in that case, but indicated that the issue was an "important" one. *Id.* at 828–29, 106 S.Ct. at 1588–89. Justice Frankfurter's concurring opinion in *United States ex rel. Marcus,* 317 U.S. at 556, 63 S.Ct. at 390, indicates that the Eighth Amendment would apply to limit sanctions imposed under a statute providing for both civil and criminal penalties,[5] but no authority has been cited to this court which directly addresses whether the Eighth Amendment's "excessive fines" provision may place a limit on punitive damages in a strictly civil action.

The Supreme Court has indicated that the provisions of the Eighth Amendment may apply to punishments which, although not designated by the state to be criminal, are essentially criminal in nature. *See, e.g., Ingraham,* 430 U.S. at 669 n. 37, 97 S.Ct. at 1411 n. 37. Defendants argue that punitive damages are "quasi-criminal" in nature and thus that the Eighth Amendment should apply to limit awards of punitive damages. Trial Memorandum of Defendant Carey Canada, Inc., at 66–67. As the court stated *supra* at 1058, a punitive

---

**3.** The *Ingraham* decision does state: "Bails, fines, and punishment traditionally have been associated with the criminal process, and by subjecting the three to parallel limitations the text of the Amendment suggests an intention to limit the power of those entrusted with the criminal-law function of government." 430 U.S. at 664, 97 S.Ct. at 1408. However, the issue of whether a civil fine may violate the Eighth Amendment proscription of excessive fines was not before the Court in *Ingraham.*

**4.** The absence of language in the Eighth Amendment which limits its provisions to criminal

proceedings takes on greater import when compared with the language of the Fifth and Sixth Amendments, which make specific reference to the criminal nature of the proceedings to which those Amendments apply.

**5.** "But *short of that which would offend the Eighth Amendment,* statutes prescribing cumulative remedies have been commonplace in the history of federal legislation." 317 U.S. at 556, 63 S.Ct. at 390 (Frankfurter, J., concurring) (emphasis added).

damages award is clearly a civil remedy, created by the judiciary, which is not intended to be a criminal penalty and which does not carry the same stigma attached to criminal penalties. Just as clearly, however, exemplary damages are meant to be punitive in nature and not remedial, and thus are closely analogous to criminal penalties. *Cf. Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963) (setting out relevant factors in considering whether a sanction is penal for purposes of constitutional analysis).

In determining whether a particular sanction is "quasi-criminal" in nature and thus subject to the constitutional protections traditionally afforded in criminal proceedings, an important factor in the Court's analysis has been whether the sanction "appears excessive" in relation to the purposes for which it is imposed. *Kennedy*, 372 U.S. at 169, 83 S.Ct. at 568. *See also, Flemming v. Nestor*, 363 U.S. 603, 617–621, 80 S.Ct. 1367, 1376–1378, 4 L.Ed.2d 1435 (1960) (application of Sixth Amendment protection to proceedings under civil section of statute); *United States v. Ward*, 448 U.S. 242, 253, 100 S.Ct. 2636, 2643, 65 L.Ed.2d 742 (1980) (application of Fifth Amendment "self-incrimination" clause to civil penalty under Federal Water Pollution Control Act); *Rex Trailer Co.*, 350 U.S. at 154, 76 S.Ct. at 222 (application of Fifth Amendment "double jeopardy" clause to civil remedy under statute). Such an analysis is not useful in the Eighth Amendment context, however. It would be the height of circular reasoning to conclude that the Eighth Amendment prohibition of "excessive fines" applies to "quasi-criminal" sanctions and that "quasi-criminal" sanctions are those which are excessive.

■ Even if the Eighth Amendment's excessive fines provision were to apply in the context of a civil award of punitive damages, however, it could not be the basis for striking plaintiff's punitive damages claim at this stage in the proceedings without a factual finding that previous awards of punitive damages have been imposed upon an individual defendant and a finding that any further monetary award would cross the line, wherever it may lie, between acceptable awards and "excessive" ones. As it now stands, courts have discretion in individual cases to reduce an award of punitive damages which is clearly excessive. Of concern to this court, however, is not the situation where an individual award of punitive damages may be excessive. Rather, it is the situation where a defendant is threatened with successive awards of punitive damages for the same course of conduct, wherein any single award might be appropriate with regard to the conduct of defendant, but where the aggregate of such awards becomes or has the potential to become excessive. Despite the similarity of the concerns underlying the Eighth Amendment to those of defendants against whom multiple awards of punitive damages may be awarded, the court concludes that application of the Eighth Amendment to civil awards of punitive damages is not warranted and that the "excessive fines" provision does not require the court to strike plaintiff's claim for punitive damages in this action.

**C. The Due Process Clause of the Fourteenth Amendment**

■ Finally, defendants argue that the Due Process Clause of the Fourteenth Amendment prohibits the imposition of successive awards of punitive damages on a defendant for one course of conduct. As the court noted *supra* at 1058, punitive damages are, by their nature and purpose, a form of punishment imposed in civil actions. However relevant the distinction between criminal, "quasi-criminal", and civil actions might be to the protections provided by the Eighth Amendment and the Double Jeopardy Clause of the Fifth Amendment, such distinctions are irrelevent under the Due Process Clause of the Fourteenth Amendment. "Due process" not only includes the protections of the Bill of Rights, but is a broader concept. The Due Process Clause of the Fourteenth Amendment requires that adjudicatory proceedings be fundamentally fair, whether those proceedings be in a criminal or in a civil context. *See, e.g., Lassiter v. Department of Social*

*Services,* 452 U.S. 18, 24, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640 (1981). Thus, although multiple awards of punitive damages for a single course of conduct may not violate the "excessive fines" clause of the Eighth Amendment or the Double Jeopardy Clause because such damages are imposed in a civil action, this court concludes that they can and do violate the "fundamental fairness" requirement of the Due Process Clause.

Justice Brennan has summarized the protections afforded by the Due Process Clause as follows:

> The Court has described the mandate of [the due process] clause as a "protection of ultimate decency in a civilized society," as a guarantee of "fairness between the State and the individual dealing with the State," and as "a fundamental principle of liberty and justice which inheres in the very idea of free government and is the inalienable right of a citizen of such a government." ... Due process asks whether government has treated someone fairly, whether individual dignity has been honored, whether the worth of an individual has been acknowledged. Officials cannot always silence these questions solely by pointing to rational action taken according to standard rules.
>
> .... It is for *these* reasons that the due process clause demands of judges more than proficiency in logical analysis. It requires that we be sensitive to the balance of reason and passion that mark a given age, and the ways in which that balance leaves its mark on the everyday exchanges between government and citizen.

Brennan, *Reason, Passion, and "The Progress of the Law",* 10 Cardozo L.Rev. 3, 15–16 (Oct./Nov.1988). In the present case, the court must view the plaintiff's claim for punitive damages in the context of the thousands of asbestos-related claims for compensatory and punitive damages which have been filed throughout the country against the defendants. The Third Circuit has described the asbestos litigation context as "an unparalleled situation in American tort law." *In re School Asbestos Litigation,* 789 F.2d at 1000.[6] Although due process concerns may not be compelling in the traditional "single plaintiff versus single defendant" punitive damages action, such concerns must be re-evaluated in light of the recent phenomenon of mass tort litigation.

The Supreme Court has not yet ruled on the issue of whether the Due Process Clause places a limit on awards of punitive damages in mass tort litigation. It has, however, indicated on several occasions that due process concerns might be implicated in situations where large punitive damage awards are imposed against a defendant. *See, e.g., Aetna,* 475 U.S. at 828–29, 106 S.Ct. at 1588–89 (Court would not reach the "important issue" of whether lack of sufficient standards governing awards of punitive damages violated due process). In *Bankers Life & Casualty Co. v. Crenshaw,* —— U.S. ——, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988), the Court did not reach the constitutional issues regarding multiple awards of punitive damages. However, Justice O'Connor, joined by Justice Scalia, noted that the amount of jury discretion in awarding punitive damages "may violate the Due Process Clause." *Id.* —— U.S. at ——, 108 S.Ct. at 1655 (O'Connor, J., dissenting). Justice O'Connor stated:

> Appellant has touched on a due process issue that I think is worthy of the court's attention in an appropriate case. Mississippi law gives juries discretion to award any amount of punitive damages in any

---

**6.** The Third Circuit went on to describe the "asbestos scene" as follows:

> To date, more than 30,000 personal injury claims have been filed against asbestos manufacturers and producers. An estimated 180,000 additional claims of this type will be on court dockets by the year 2010. Added to those monumental figures are the claims for property damage—the cost of removing or treating asbestos-based materials used in building construction. Some indication of the magnitude of that potential liability may be gleaned from the fact that the property damage claims filed in the Johns–Manville bankruptcy proceedings stood at $69 billion as of June, 1985.

*Id.*

tort case in which a defendant acts with a certain mental state. In my view, because of the punitive character of such awards, there is reason to think that this may violate the Due Process Clause.... Punitive damages are not measured against actual injury, so there is no objective standard that limits their amount. Hence, "the impact of these windfall recoveries is unpredictable and potentially substantial." For these reasons, the Court has forbidden the award of punitive damages in defamation suits brought by private plaintiffs and in unfair representation suits brought against unions under the Railway Labor Act. For similar reasons, the Court should scrutinize carefully the procedures under which punitive damages are awarded in civil lawsuits.

*Crenshaw,* —— U.S. at ——, 108 S.Ct. at 1655 (O'Connor, J., dissenting) (citations omitted).

Justice Rehnquist has stated for the Court that "the Due Process Clause, like its forebear in the Magna Carta, was ' "intended to secure the individual from the arbitrary exercise of the powers of government." ' " *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) (quoting *Hurtado v. California,* 110 U.S. 516, 527, 4 S.Ct. 111, 116, 28 L.Ed. 232 (1884), which quotes *Bank of Columbia v. Okely,* 17 U.S. (4 Wheat.) 235, 244, 4 L.Ed. 559 (1819)). In the past, the indefinite rules governing a jury's discretion in awarding punitive damages were not considered to be so arbitrary as to implicate due process concerns. *See, e.g., Missouri Pacific Railway v. Humes,* 115 U.S. 512, 523, 6 S.Ct. 110, 114, 29 L.Ed. 463 (1885) (legislative provision for punitive damages within a fixed limit not violative of due process). However, in recent years several courts have echoed this court's concern that the discretion given to juries in awarding punitive damages, when viewed in the

relatively new context of mass tort litigation where defendants are subjected to hundreds of lawsuits claiming punitive damages based on a single course of conduct, deprives a defendant of the "fundamental fairness" required by the Due Process Clause.[7]

Courts have most often expressed their concern about repetitive punitive damages awards in mass tort litigation by attempting to certify mandatory class actions on the issue of liability for and amount of punitive damage awards. *See, e.g., In re School Asbestos Litigation,* 789 F.2d 996; *In re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718 (E.D.N.Y.1983); *In re Northern District of California "Dalkon Shield" IUD Products Liability Litigation,* 526 F.Supp. 887 (N.D.Cal.1981), vacated, 693 F.2d 847 (9th Cir.1982), *cert. denied, A.H. Robins Co. v. Abed,* 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983); *In re Federal Skywalk Cases,* 680 F.2d 1175 (8th Cir.1982), *cert. denied, Stover v. Rau,* 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982). In its *Federal Skywalk* opinion, the Eighth Circuit reversed the district court's certification of a mandatory class action on the issue of punitive damages, finding that defendants had not shown that there was a limited fund for the payment of punitive damages. 680 F.2d at 1182. Judge Heaney dissented, arguing that class certification was justified in order to reduce the risks that individual juries would reach inconsistent results and that late-filing plaintiffs would receive reduced or no awards of punitive damages. Judge Heaney stated:

> Unlimited multiple punishment for the same act determined in a succession of individual lawsuits and bearing no relation to the defendants' culpability or the actual injuries suffered by victims, would violate the sense of "fundamental fair-

---

7. Judge Friendly's opinion in *Roginsky v. Richardson–Merrell, Inc.,* 378 F.2d 832 (2d Cir.1967) has been proven to have been accurate in its prediction that repetitive punitive damages awards for a single course of conduct in mass tort litigation could reach a staggering amount.

The *Roginsky* opinion warned that unless such awards were restricted to fixed and measurable amounts, the cumulative effect of such punishment would violate defendants' due process rights.

ness" that is essential to constitutional due process.

*Id.* at 1188 (citations omitted).

In the *"Dalkon Shield"* action, the district court granted class certification for punitive damages claims based on submissions by defendants that a limited fund existed. In doing so, the court stated:

> A defendant has a due process right to be protected against unlimited multiple punishment for the same act. A defendant in a civil action has a right to be protected against double recoveries not because they violate "double jeopardy" but simply because overlapping damage awards violate that sense of "fundamental fairness" which lies at the heart of constitutional due process. Certainly the principle of res judicata, the notion that litigation must come to an end, that a party cannot sue or be sued repeatedly on the same cause of action, is a part of the process that is due under our constitutional system.

526 F.Supp. at 899. The district court, in concluding that class certification was necessary to avoid the due process concerns cited above, noted that the Supreme Court has "often recognized that limitations, up to and including elimination, may be placed on the power to award punitive damages if there exists a strong countervailing interest." *Id.* at 898 (footnote omitted). The court found that the interests underlying the Due Process Clause presented an interest strong enough to justify a limitation on punitive damage awards. However, the Ninth Circuit later vacated the district court's conditional certification of a class on the issue of punitive damages, holding that there was not sufficient evidence before the district court to support a finding that a "limited fund" existed for the purposes of class certification. *In re Northern District of California, Dalkon Shield IUD Products Liability Litigation,* 693 F.2d at 852.[8]

In the *"Agent Orange"* case, the district court held that class certification on the issue of punitive damages was both proper and necessary in light of the probability that earlier awards might exhaust defendants' assets. The court stated:

> In theory, therefore, when a plaintiff recovers punitive damages against a defendant, that represents a finding by the jury that the defendant was sufficiently punished for the wrongful conduct. There must, therefore, be some limit, either as a matter of policy or as a matter of due process, to the amount of times defendants may be punished for a single transaction.

100 F.R.D. at 728 (citations omitted). This court concludes that due process requires such a limit on the imposition of punishment in the present case.

■ In the context of asbestos litigation, however, class certification is not available as a limitation on punitive damage awards, and thus the due process concerns implicated by multiple awards of punitive damages cannot be satisfied by certification of a class. In its *School Asbestos Litigation* opinion, the Third Circuit recognized that "powerful arguments" existed in support of the proposition that repeated awards of punitive damages for the same acts should be prohibited as a matter of substantive due process. 789 F.2d at 1005. However, the court found that, even if the above constitutional concerns regarding punitive damages provided a threshold justification for certification of the class, the district court had abused its discretion in certifying a class on the punitive damages issue because the class was irreconcilably under-inclusive. The Third Circuit held that it was unlikely that any class could be certified in the asbestos context for the purposes of managing awards of punitive damages:

> Nor do we see how, in the present context of this litigation, the class could be expanded to confront effectively the punitive damages issue in the entire asbestos area.

*Id.* at 1006.

The court notes that one other court has reached the issue of whether due process

---

8. The Ninth Circuit also held that the "commonality" requirement of Fed.R.Civ.P. 23(a) could not be met because different standards for punitive damages claims exist in each of the fifty jurisdictions in which the cases arose, 693 F.2d at 850, and that the typicality and adequacy of representation requirements of Rule 23(a) had not been met. *Id.* at 850–51.

prohibits multiple awards of punitive damages for the same course of conduct. In *Cathey v. Johns–Manville Sales Corp.*, 776 F.2d 1565 (6th Cir.1985), *cert. denied*, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986), the Sixth Circuit dismissed the defendant's argument that its constitutional guarantee of due process was violated by multiple civil punishment for a single course of conduct, holding:

> As a matter of federal constitutional law we believe that the presence of a judicial tribunal before which to litigate the propriety of a punitive damages award provides Johns–Manville with all of the procedural safeguards to which it is due.

*Id.* at 1571. However, the Third Circuit has since rejected the Sixth Circuit's approach in *Cathey* to the problem of multiple awards of punitive damages, stating:

> *Cathey* treated the defendant's argument on punitive damages as raising only a procedural due process issue. But the concerns recited by a number of courts and commentators are centered on the substantive component of due process.

*In re School Asbestos Litigation*, 789 F.2d at 1004 (citations omitted). Due process requires more than simply the provision of a judicial proceeding.[9] It requires that any such proceeding be fundamentally fair, and this court concludes that subjecting defendants to the possibility of multiple awards of punitive damages for the single course of conduct alleged in this action would deprive defendants of the fundamental fairness required by the Due Process Clause. The court also concludes that, in the context of asbestos litigation, certification of a class on the issue of punitive damages is not a possible remedy for this constitutional violation.

The court does not hold that because the sanction of punitive damages is a form of punishment, all of the constitutional protections afforded to criminal sanctions also apply to the imposition of punitive damages. Rather, the court holds that due process places a limit on the number of times and the extent to which a defendant may be subjected to punishment for a single course of conduct. Regardless of whether a sanction is labelled "civil" or "criminal" in nature, it cannot be tolerated under the requirements of due process if it amounts to unrestricted punishment.

## IV. CONCLUSION

The right to assess punitive damages in mass tort litigation permits a jury to punish but not to execute a company. As stated above, there indeed may be instances in which the conduct is so outrageous or the product so dangerous that the jury intends to terminate the ability to produce it. However, those rare circumstances should be the decision of a single jury based upon all of the available evidence, not the inadvertent result of the cumulative effect of a series of awards, the sum of which is not subject to judicial review.

The court reiterates that potential and actual punitive damage awards may continue to serve a vital function in establishing standards of conduct and providing a means to punish and deter those who deviate from those standards. However, it is argued with equal force that the potential for astronomical punitive damage awards may run counter to the public interest by inhibiting research and development of new products, including those aimed at promoting good health and curing disease. Mass tort litigation and serial claims arising out

**9.** Justice Stevens, concurring in *Daniels v. Williams*, 474 U.S. at 337, 106 S.Ct. at 667, eloquently described the protections embodied in the Due Process Clause:

> It is not enough to note that [petitioners] rely on the Due Process Clause of the Fourteenth Amendment, for that Clause is the source of three different kinds of constitutional protection. First, it incorporates specific protections defined in the Bill of Rights. Thus, the State, as well as the Federal Government, must comply with the commands in the First and Eighth Amendments; so too, the State

> must respect the guarantees in the Fourth, Fifth, and Sixth Amendments. Second, it contains a substantive component, sometimes referred to as 'substantive due process,' which bars certain arbitrary government actions 'regardless of the fairness of the procedures used to implement them.'
> Third, it is a guarantee of fair procedure, sometimes referred to as 'procedural due process': the State may not execute, imprison, or fine a defendant without giving him a fair trial, nor may it take property without providing appropriate procedural safeguards.

of the same conduct mandate a re-examination of the purpose of such awards and their constitutionality.

The court concludes that a manufacturer or other mass tortfeasor cannot be subjected to repeated punitive damage awards for the same conduct. In the absence of a class action which binds all claimants, resolution of such claims requires legislation. Such legislation must: (1) determine initially whether punitive damages should be allowed in mass tort cases, and if so; (2) establish standards for their imposition and for the amounts to be awarded; (3) determine if maximum limits should be imposed and whether they should be by fixed amount or some formula based upon the net worth of the defendant; (4) provide procedures for dealing with successive claims; and (5) determine who shall be entitled to receive and participate in those awards.

If punitive damage awards are to continue to play a vital role in our society, they must adjust to the recent phenomenon of mass tort litigation. There must be a means available by which we can continue to punish and deter those who abuse the trust of the marketplace without allowing the punishment to be so repetitive and excessive as to violate fundamental fairness.

Due process requires that a limit be placed upon a defendant's liability for punitive damages for a single course of conduct. If a defendant's conduct has been evaluated by a factfinder, and if that factfinder has made an assessment of the amount of punitive damages necessary to deter and punish that conduct, then this court concludes that any further punishment would be unnecessary, repetitive, and a violation of due process. Thus, with respect to those defendants who are able to present competent proof that liability for punitive damages has already been imposed upon them for the conduct alleged to be the basis of a punitive damage claim in this action, the court will dismiss plaintiff's claim for such punitive damages.